IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVEREST STABLES, INC.,** | : | CIVIL ACTION NO. 1:14-CV-1631 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **MICHAEL JESTER, PENN RIDGE FARMS, LLC, and THOMAS REIGLE,** | : | |
| Defendants | : | |

## MEMORANDUM

Everest Stables, Inc. ("Everest") filed the instant motion (Doc. 38) pursuant to Federal Rule of Civil Procedure 56, seeking partial summary judgment with respect to certain breach of contract theories asserted in Count I of its amended complaint (Doc. 37) against Michael Jester ("Jester") and Penn Ridge Farms, LLC ("Penn Ridge"), collectively, "defendants." The court will deny Everest's motion.

### I.   Factual Background and Procedural History[1]

Everest is a renowned owner and breeder of Thoroughbred stallions, broodmares, foals, and racehorses, with a principal place of business in Stillwater, Minnesota. (Doc. 40 ¶ 1; Doc. 45 ¶ 1; see Doc. 37 ¶ 1). Penn Ridge is a Pennsylvania-

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from Everest's Rule 56.1 statement of material facts and defendants' response thereto. (See Docs. 40, 45). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts. (See also Docs. 37, 42, 43).

based breeding, boarding, and stallion facility for Thoroughbreds. (Doc. 37 ¶ 10; Doc. 42 ¶ 10; Doc. 43 ¶ 10). Jester is the owner of Penn Ridge. (See Doc. 37 ¶ 9; Doc. 42 ¶ 9; Doc. 43 ¶ 9). At all times relevant to this litigation, nonmoving defendant Thomas Reigle ("Reigle") was Penn Ridge's stallion manager. (See Doc. 37 ¶ 11; Doc. 42 ¶ 11; see also Doc. 43 ¶ 11; Doc. 39-3, Reigle Dep. 5:18-6:11, June 8, 2015 ("Reigle Dep.")).

In September of 2011, Everest and Penn Ridge entered into a boarding and stallion services agreement ("the agreement"). (Doc. 39-1; see also Doc. 40 ¶ 3; Doc. 45 ¶ 3). Therein, Everest agreed to stand its stallion, "Petionville," for stud services at Penn Ridge. (See Doc. 40 ¶ 3; Doc. 45 ¶ 3; see also Doc. 39-1 at 1). The agreement provides an advertised standing price for Petionville's stud services of $6,000 for the 2012 breeding season or $4,500 for mares foaling in Pennsylvania. (See Doc. 39-1 at 1). Everest later authorized Penn Ridge to negotiate lower prices for Petionville's service contracts, setting the minimum price at $4,000. (Doc. 40 ¶ 14; see Doc. 45 ¶ 14). The agreement designates Penn Ridge to act as Everest's agent and requires Penn Ridge to "exercise its utmost good faith to promote, manage[,] and sell [Petionville's] stallion seasons." (Doc. 39-1 at 2).

The agreement awards three complimentary Petionville breedings to Penn Ridge for use exclusively with its own mares. (See Doc. 39-1 at 2). It further grants a single complimentary breeding to Reigle, "to be used only by [Reigle] and . . . not [to] be resold," contingent upon his delivery to Everest of "forty-five (45) signed

2

stallion contracts . . . for a single breeding season."  (Id.; see also Doc. 40 ¶ 10; Doc. 45 ¶ 10).

The agreement also addresses stallion registration paperwork, providing that "[a]ll stallion paperwork concerning [Petionville] will be completed by Penn Ridge Farms including registration for the Breeders Cup and PA Breeders Association, Jockey Club stallion reports, etc.," with costs of said registrations to be paid by Everest.  (Doc. 39-1 at 2).  The parties explain that foals certified as "PA-Bred" by the Pennsylvania Horse Breeders Association ("the Breeders Association") receive certain exclusive benefits, including eligibility for "lucrative" awards and entry preference at certain Pennsylvania Thoroughbred racetracks.  (Doc. 40 ¶ 2; Doc. 45 ¶ 2).

Everest also agreed to board mares, foals, and foal mares at Penn Ridge, at a daily rate of $22.00 for mares, $20.00 for weaned foals, and $1.00 for nursing foals.  (See Doc. 39-1 at 1; see also Doc. 40 ¶ 3; Doc. 45 ¶ 3).  Everest would "be allowed . . . [a] 5% deduction" for all boarding bills paid to Penn Ridge before the 22nd of each month.  (Doc. 39-1 at 3; see Doc. 40 ¶ 16; Doc. 45 ¶ 16).  The three-page agreement is silent with respect to time for performance or payment of either party's obligations thereunder.  (See Doc. 39-1 at 1-3).

Everest moved Petionville and a number of its mares to Penn Ridge pursuant to the agreement.  (Doc. 37 ¶ 19; Doc. 42 ¶ 19).  During the 2012 breeding season, Penn Ridge entered into forty-nine stallion service contracts for Petionville's stud services.  (See Doc. 20 ¶ 20; Doc. 42 ¶ 20).  The Petionville stallion service contracts

provide that a buyer's stud fees are due and payable to Penn Ridge "on the 15th day following the birth of a single live foal which can stand alone and nurse." (Doc. 37 ¶ 22; Doc. 37-2). In approximately mid-2013, foals from the 2012 breeding season were born. (See Doc. 40 ¶ 5; Doc. 45 ¶ 5).

The parties agree on limited but pertinent facts. Defendants acknowledge, for example, that Jester arranged for the sale of a Petionville stallion season for $3,000, representing a $1,000 discount below Everest's minimum authorized price. (See Doc. 40 ¶ 15; Doc. 45 ¶ 15). Jester explained that he offered the discount as a gesture of goodwill to the Breeders Association's president. (See Doc. 45 ¶ 15; see also Doc. 39-4, Jester Dep. 43:12-45:7, June 8-9, 2015 ("Jester Dep.")). Jester further testified that Penn Ridge provided Everest a $1,000 invoice credit as reimbursement for the unauthorized discounted breeding. (See Jester Dep. 44:1-45:10). Defendants also concede that Reigle sold his complimentary breeding to Peter Goulding, owner of the mare "I've Got Honor." (Doc. 40 ¶¶ 10-12; Doc. 45 ¶¶ 10-12). Reigle explained that he understood the phrase "not to be resold" to be a prohibition against sale at public auction, not against private sale. (See Doc. 45 ¶ 12 (citing Reigle Dep. 56:9-58:9)). Reigle testified that he offered full compensation to Everest for his mistake, but Everest refused payment. (See Reigle Dep. 58:10-19).

The parties' accounts of the remainder of the 2012 season diverge materially. Penn Ridge initially mailed Petionville's stud fees to Everest between two and four weeks after collecting the fees from buyers. (See Doc. 39-5; see also Doc. 46 at 3-4). On May 15, 2013, an Everest representative emailed Reigle noting frustration with

this perceived "delay" and directing Penn Ridge "to forward the Petionville stallion fees as soon as" they are collected. (Doc. 39-5; see Doc. 39 at 10). Everest's owner, Jeffrey Nielsen ("Nielsen"), asserts that Penn Ridge remitted no stud fees at all for breedings to the mares "Prairie Heat," "Indiana Lady," "Forlorn Hope," "Storm Dixie," and "The Last Deanie." (See Doc. 40 ¶ 9). From October through December of 2013, Nielsen emailed Reigle seven times requesting payment of the outstanding fees. (See Doc. 39-6). According to Nielsen, Penn Ridge refused payment despite his demands. (Doc. 40 ¶¶ 5-7; see Doc. 44-4, Nielsen Dep. 51:12-53:12, June 9, 2015 ("Nielsen Dep.")). Jester testified that Penn Ridge retained the stud fees as a "self-help" remedy given Everest's reciprocal delinquency on boarding fees due and owing to Penn Ridge. (See Jester Dep. 53:10-54:13; see also Doc. 45 ¶¶ 5-9). Nielsen explained that Everest did withhold boarding fees for the final months of 2013, but did so as a setoff against Penn Ridge for the outstanding stud fees. (See Nielsen Dep. 63:12-65:24; see also Doc. 40 ¶ 17; Doc. 46 at 17).

Defendants similarly concede that Penn Ridge failed to submit certain paperwork to the Breeders Association for three foals born at Penn Ridge in 2013. (Doc. 40 ¶ 13; Doc. 45 ¶ 13). Reigle testified that Penn Ridge would typically submit registration paperwork by December 31 of the year in which a foal was born. (See Reigle Dep. 97:12-24). Jester again explained that he did not submit the paperwork in this case because he "wanted to be paid the board bills" owed by Everest. (Jester Dep. 81:24-82:19). According to Jester, Everest owes Penn Ridge at least $18,719.83 in outstanding board bills. (See id. at 82:16-84:7; see also Doc. 45 ¶ 8). Everest

maintains that Penn Ridge owes "a total of $22,250" for wrongfully withheld stud fees. (Doc. 40 ¶ 8).

Finally, the parties agree that Penn Ridge did not reduce Everest's monthly boarding invoices to reflect the five percent early payment discount contemplated by the agreement. (Doc. 40 ¶ 16; see Doc. 45 ¶ 16). Defendants admit that Everest made timely payments through late fall of 2013, (Doc. 40 ¶¶ 16-17; Doc. 45 ¶¶ 16-17), but posit that Everest "did not avail itself of the discount" by reducing its payments unilaterally. (Doc. 45 ¶ 16). Everest demanded a refund of $8,752.10 in November of 2013 to reimburse the uncredited discount. (Doc. 40 ¶ 16; Doc. 45 ¶ 16). According to defendants, Everest received a partial invoice credit in January of 2014 but was not entitled to the full amount requested. (See Doc. 45 ¶ 16). Nielsen acknowledged that Everest received a credit on the January 2014 invoice, but stated further that he "ha[s] no idea" why Penn Ridge issued the credit and that it could not "have been . . . part of the credit that [we] were due for early payment." (See id. (citing Nielsen Dep. 136:9-137:11)).

Everest commenced this action by filing a four-count complaint (Doc. 1) on August 20, 2014. The matter is currently proceeding by amended complaint (Doc. 37) filed with the court's leave on July 9, 2015. Everest asserts claims for breach of contract (Count I), breach of fiduciary duty (Count II), and unjust enrichment (Count IV) against Jester and Penn Ridge, as well as claims for tortious interference with prospective economic advantage (Count III) and negligence (Count V) against Jester, Penn Ridge, and Reigle. (Doc. 37). On August 3, 2015, Jester and Penn

Ridge filed a counterclaim (Doc. 43) for breach of contract against Everest for failure to pay boarding fees during the last quarter of 2013.  Everest now moves the court for partial summary judgment on five separate theories of liability underlying Count I of its amended complaint.  (See Doc. 38).  The motion is fully briefed (Docs. 39, 44, 46) and ripe for disposition.

## II.  Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

## III.  Discussion

Everest seeks summary judgment with respect to five of thirteen breach of contract claims alleged in Count I of its amended complaint.  Specifically, Everest urges the court to find, as a matter of law, that Jester and Penn Ridge breached the agreement by: (1) discounting a Petionville stallion season below the minimum

7

authorized price; (2) allowing Reigle to privately sell his complimentary breeding despite a clear prohibition against such sales; (3) failing to timely remit fees for Petionville's stallion service contracts; (4) failing to timely sign and submit to the Breeders Association registration paperwork for foals born from the 2012 breeding season; and (5) failing to apply the five percent timely payment discount and to refund the aggregate discount when requested. (See Doc. 39 at 1-2).

Defendants' response is manifold. Defendants initially note that Everest fails to identify any substantive law in support of its breach of contract claim. (Doc. 44 at 1-2). On timeliness, defendants observe that the agreement contains no deadline for performance and that a "reasonable time" term should not be implied. (Id. at 3-5, 7-8). Defendants also emphasize that, by the time Everest demanded payment of stud fees and submission of registration paperwork, a *bona fide* dispute had developed with respect to who owed what to whom. (Id. at 6-7). Defendants further contend that Everest rejected their attempts to cure certain perceived breaches in full and thus failed to mitigate damages. (See id. at 8-11). Finally, defendants assert that any breach is immaterial. (See id. at 11-12).

Notwithstanding the parties' multifarious arguments, the Rule 56 inquiry remains narrowly defined: the court must determine whether undisputed record evidence entitles Everest to partial summary judgment as a matter of law. See FED. R. CIV. P. 56(a). A cursory review of the record reveals marked disputes of material fact, answering the court's inquiry in the negative and precluding partial summary judgment in Everest's favor.

Pennsylvania substantive law governs this diversity action.  See Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  To prevail on its claim for breach of contract under Pennsylvania law, Everest must prove: (1) the existence of a contract, including its essential terms; (2) defendants' breach of a duty imposed by those terms; and (3) actual loss or injury resulting from the breach.  See Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

### A. Time for Performance

Two of Everest's theories of breach rest on its assertion that defendants failed to timely remit stud fees for Petionville's stallion contracts and to complete registration paperwork for three foals born at Penn Ridge.  (See Doc. 39 at 9-12, 17-19).  However, the parties' agreement contains no fixed timeline for performance.[2]  (See Doc. 39-1 at 1-3).  Principals of both Penn Ridge and Everest agree on this essential fact.  (See Jester Dep. 99:6-15; see also Nielsen Dep. 43:10-24).  Hence, defendants cannot be said to have violated an express term of the agreement.

Everest suggests in its reply brief that a term requiring performance within a "reasonable time" is implied in every contract otherwise silent on the issue.  (See Doc. 46 at 1-6).  This contention is well supported by the law: when a contract does not specify the time for performance, Pennsylvania courts routinely "require that

---

[2] Indeed, the agreement is entirely silent with respect to the procedure for stud fee collection and remittance.  (See Doc. 39-1 at 1-3).

the obligation be performed within a 'reasonable' time." Hodges v. Pa. Millers Mut. Ins. Co., 673 A.2d 973, 974-75 (Pa. Super. Ct. 1996) (collecting cases).

On the present record, Everest makes no undisputed showing of unreasonable delay. Instead, Everest merely avers that defendants' purported dilatoriness offends its own sense of what an appropriate time for performance ought to have been. (See Doc. 39 at 9-11; Doc. 46 at 4-5; see also Doc. 40 ¶¶ 4, 13; Nielsen Dep. 41:9-43:24). Everest cites only to its unilateral email to Reigle voicing Everest's concerns with Penn Ridge's initial two to four week remittance period. (Doc. 46 at 5-6; see Doc. 39 at 10-12). Everest adduces no evidence that the parties mutually intended to impose a remittance deadline of two to four weeks.

Evidence of events circumambient to defendants' purported breach further prevents a judicial finding in Everest's favor. Jester testified that Penn Ridge did not remit the requested fees or submit certain stallion paperwork because Everest itself was delinquent on boarding fees due from October 2013 onward. (See Jester Dep. 81:15-84:17). Defendants contend that any nonperformance on their part was justified as "self-help" in response to Everest's parallel default. (See Doc. 44 at 6). Nielsen's testimony reveals that Everest took a similar position: boarding bills would not be paid until defendants remitted outstanding fees. (See Nielsen Dep. 63:12-65:24). Given this additional layer of conflict, the court cannot find as a matter of law that Everest is entitled to partial judgment.

10

## B.     Remaining Breach of Contract Theories

The balance of Everest's Rule 56 arguments rely on an equally unsettled record.  Everest contends that it suffered damage when defendants failed to apply an early payment discount to its monthly invoices, sold one of Petionville's stallion seasons below the minimum authorized price, and sold a complimentary breeding to a third party owner.  (See Doc. 39 at 12-16).  Everest cites no proof of resultant damage, a failure which is arguably fatal to its Rule 56 pursuit.  (See generally Doc. 40 ¶¶ 1-17); see also Ware, 322 F.3d at 225-26.  Further precluding partial judgment, however, is defendants' responsive evidence, which exposes genuine factual disputes pertinent to Everest's remaining claims.

Regarding the early payment discount, Everest contends that it is owed $8,752.10, and that defendants "failed and refused to refund the monies owed" when requested.  (Doc. 40 ¶ 16).  *Per contra*, defendants submit that Penn Ridge *did* credit Everest with an early payment discount in an invoice reconciliation, albeit with less than the full amount sought by Everest.  (See Doc. 44 at 7; Doc. 45 ¶ 16).  Specifically, defendants cite a January 31, 2014 invoice reflecting a credit to Everest of $6,908.40 and indicate that, by defendants' calculation, this credit represents the full amount owed.  (See Doc. 45 ¶ 16).  Everest acknowledges the reduction but rejoins cursorily that "it was not the credit due for early payment," citing Nielsen's testimony that he was not sure what triggered the January 2014 credit.  (Doc. 46 at 12 (citing Nielsen Dep. 136:9-137:11)).  Hence, a genuine dispute remains regarding

whether Penn Ridge breached the early payment discount provision and whether Everest was damaged thereby.

The damages aspect of Everest's unauthorized discount and sale claims is likewise controverted.  Everest asserts broadly that it was damaged as a result of defendants' actions and that "no effort to cure" was made.  (See Doc. 46 at 16-17).  Record evidence flatly refutes this contention.  Reigle testified that Everest rebuked his offer of $4,000 as full reimbursement Everest for the sale of his complimentary breeding.  (See Doc. 44 at 8-11 (citing Reigle Dep. 56:9-58:19)).  With respect to the unauthorized $1,000 discount offered to the Breeders Association's president, Jester testified that he credited $1,000 back to Everest's account as recompense.  (See id. (citing Jester Dep. 44:10-45:25)).  It is for the jury and not a judge to measure the veracity of these competing assertions.

### IV.   Conclusion

The factual disputes *sub judice* are many and material.  The court will deny Everest's motion (Doc. 38) for partial summary judgment and set this matter on a jury trial schedule.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER  
Christopher C. Conner, Chief Judge  
United States District Court  
Middle District of Pennsylvania

Dated:      March 9, 2016